(C. D. 1228)

F. W. Myers & Co., Inc. *v.* United States

United States Customs Court, First Division

(Decided April 4, 1950)

*Barnes, Richardson & Colburn* (*Eugene F. Blauvelt* of counsel) for the plaintiff. *David N. Edelstein,* Assistant Attorney General (*Richard F. Weeks* and *William J. Vitale,* special attorneys), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: This case was originally decided in *F. W. Myers & Co., Inc.* v. *United States,* 20 Cust. Ct. 152, C. D. 1100, and is before us now following rehearing which was granted on motion of plaintiff, *Same* v. *Same,* 20 Cust. Ct. 327, Abstract 52363.

The two protests, although consolidated for the purposes of trial by consent of the parties, relate to different classes of merchandise, presenting separate and distinct issues. It is, therefore, necessary to discuss each by itself and apart from the other.

While consolidation herein is somewhat violative of the rule permitting such practice, because in this instance the merchandise and the issue are not the same in the two consolidated cases, the fact that the protests grew out of one entry explains the procedure. It is not the best practice to pursue because of the difficulty the court experiences in applying one record to two entirely different situations. If the true condition had been made clear at the time consolidation

was requested and an objection had been entered by opposing counsel, it is doubtful if the request would have been granted. Rule 38 of this court, titled "CONSOLIDATION OF ACTIONS," provides for a joint hearing or trial when the actions involve "a common question of law or fact." Such is not the case in this proceeding.

Protest 132174–K relates to lacquer reducer described in the Government analyst's report, illustrative exhibit F, as "a mixture of 64% ethyl acetate and 36% amyl alcohol by weight." It was classified under paragraph 24 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 24) as a mixture of chemical compounds containing more than 20 per centum of alcohol but not in excess of 50 per centum, and was accordingly assessed with duty at 40 cents per pound and 25 per centum. Plaintiff claims that the product contains no alcohol and therefore is classifiable as a mixture of chemical compounds, not specially provided for, under paragraph 5 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 5), carrying a duty assessment of 25 per centum ad valorem.

The lacquer reducer, or thinner, in question contains three chemical compounds—i. e., ethyl acetate, butyl acetate, and petroleum naphtha—physically mixed. Frank L. Steel, chief chemist of the Canadian manufacturer and exporter of the said merchandise, and who developed the formulas for all of the products in question, explained the ingredients of the lacquer reducer in this manner: Ethyl acetate, amounting to 48.2 per centum of the product, and butyl acetate of which there is 21.1 per centum, are esters, the former being the combination of ethyl alcohol and acetic acid, and the latter created by combining butyl alcohol and acetic acid, with the alcohol losing its identity as such in the resulting compounds. The petroleum naphtha is a commercial product of the American Mineral Spirits Company, purchased by the Canadian manufacturer of the lacquer reducer under the trade name "Lactol Spirits," plaintiff's exhibit 3, which the witness called " a light petroleum fraction, similar to gasoline," and also characterized as "a spirit of naphtha and alcohol and is sometimes described as a spirit wash." Questioned concerning the presence of amyl alcohol, the witness stated that there was none, and "furthermore we don't use amyl alcohol in the plant. We don't have any in the plant and haven't had any for a great many years."

The criticism in plaintiff's brief of the finding in our previous opinion that plaintiff's proof contained an admission that the lacquer reducer contained alcohol is not justified because counsel evidently overlooked the witness' testimony that "Lactol Spirits" is "a spirit of naphtha and alcohol" which was construed as an admission that

the lacquer reducer did in fact contain alcohol of some class or kind, and which virtually formed the basis for the following conclusion in our earlier decision, C. D. 1100, *supra*:

The contradiction between the parties' testimony, if there is any real contradiction, can be resolved by further consideration of the presence of the "Lacto Spirits." The ingredient is concededly a product obtained from a source outside the plant where the imported lacquer reducer is manufactured. Consequently, the Canadian exporter has no control over the production of what it terms "petroleum naphtha," used in its products. Such circumstances, coupled with plaintiff's admission that alcohol is contained in "Lacto Spirits," serve to support the Government analyst's conclusion, showing an alcohol content of the imported merchandise.

In sustaining the collector's classification of the lacquer reducer under paragraph 24, *supra*, as shown by the foregoing quotation, we did so on a record in which the testimony referred to stood alone, without any amplification. However, at the trial pursuant to the order granting rehearing, plaintiff introduced additional evidence, clarifying its original presentation and materially changing the effect of its earlier proof.

It is now shown, by way of clarification and without any apparent purpose of contradicting any of plaintiff's testimony in the initial record, that "Lactol Spirits" is a liquid composed entirely of hydrocarbon oils and contains no alcohol or esters. This fact is conclusively established through oral testimony and an analyst's report. A technical representative of the American Mineral Spirits Company, manufacturer of "Lactol Spirits," testified, after identifying a sample of the said substance, plaintiff's exhibit 3, that the commodity is manufactured to meet certain specifications, and that throughout his 9 years' experience, such specifications have remained the same. The report of a Government chemist, who, by consent of the parties, received a portion of the said sample, exhibit 3, *supra*, for analysis, states that "Lactol Spirits" contains "no alcohol or esters," plaintiff's exhibit 4.

Thus plaintiff, through its additional evidence offered at the second trial, has supplied an omission that existed in its original case and which, with the weight it deserved in assessing the testimony at that time, would have been persuasive in reaching a conclusion favorable to its claim. In the light of the supplemented record and plaintiff's complete proof as it now appears, the testimony of the Government chemist, who was defendant's sole witness at the first trial of the case, assumes a different aspect from that revealed in the original record. His finding of hydroxy value with a consequent conclusion of alcoholic content was based on an analysis of a small laboratory sample of the imported liquid.

In contradiction thereof, and showing that the product under discussion contained no alcohol, there is the positive testimony of plaintiff's chemist who originated the formula for, and supervised the manufacture of, the present merchandise, supported by convincing proof concerning the ingredients of "Lactol Spirits," the domestic product used by the Canadian exporter in manufacturing the imported commodity. Giving to the Government chemist full recognition of his qualifications and competency, as we did in our earlier decision, and, based on the present record, the preponderance in weight of the evidence establishes that the lacquer reducer in question contains no alcohol. The merchandise is therefore excluded from the provisions of paragraph 24, *supra*, as classified by the collector, within the statutory construction of said paragraph as set forth in *Arnold & Co.* v. *United States*, 20 C. C. P. A. 417, T. D. 46259, wherein the court stated: "We are of the opinion that the term 'alcoholic compound' found in paragraph 24, *supra*, means a compound or mixture of two or more ingredients, which compound contains alcohol and which alcohol is present when the compound is completed." Being a mixture of chemical compounds, not specially provided for, the lacquer reducer in question is within the provision for such merchandise in paragraph 5, *supra*, as claimed by plaintiff.

We consider now protest 132175–K, which involves merchandise described on the invoice as "Lacquer Sealer" and "Lacquer," the latter embracing two items, identified as "flat lacquer" and "clear lacquer." The three products were classified under paragraph 30 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 30), which provides for "Collodion and other liquid solutions of pyroxylin, of other cellulose esters or ethers, or of cellulose, 30 cents per pound." They are claimed to be dutiable at 15 per centum ad valorem under the provision in paragraph 75 of the Tariff Act of 1930, as amended by the trade agreement with the United Kingdom, 74 Treas. Dec. 253, T. D. 49753, for "Varnishes, including so-called gold size or japan, not specially provided for."

The factual foundation upon which the issue rests is the same as that before us when our previous decision, C. D. 1100, *supra*, was rendered. Adhering thereto, we quote our findings of fact as set forth therein:

"The manufacturing sheets, itemizing the ingredients with their proportionate percentages in each of the products and recognized by plaintiff's witness [chief chemist of the Canadian manufacturing company] as following his original formula and as having been used in the production of the present merchandise, are in evidence; illustrative exhibit C for the clear lacquer, illustrative D for the flat lacquer, and illustrative exhibit E for the lacquer sealer. Each in-

gredient and its function in the clear lacquer, as described by plaintiff, are as follows:

| Ingredient | Function |
| --- | --- |
| Ester gum | Film former |
| Nitrocellulose (gun cotton) | Film former |
| Castor oil | Film former and plasticizer |
| Dibutyl phthalate | Film former and plasticizer |
| Toluene | Diluent |
| Ethyl acetate | Solvent |
| Butyl acetate | Solvent |
| Ethyl alcohol | Ingredient of gun cotton |
| Petroleum naphtha (Lacto Spirit) | Diluent |
| Secondary butyl alcohol | Solvent |

"In the case of the flat lacquer, the components are substantially the same as those just enumerated, with the addition of zinc stearate, which is a soapy material, making the lacquer flat. The lacquer sealer contains the same ingredients, but the zinc stearate is included therein to give the material a 'sanding effect.'

"The Government analyst's report, illustrative exhibit F, *supra*, states that the 'lacquer' is 'a solution of cellulose nitrate compound (pyroxylin) in ethyl acetate and amyl alcohol,' and in the course of his oral testimony, the analyst stated in effect that the same description would apply to all three products.

"While plaintiff's witness testified, in response to direct questions, that all of the products could be described as a varnish, which he defined as 'a very general term which to me indicates any form of clear coating material' (R. 12), on cross-examination he identified each as pyroxylin lacquer, in the following line of testimony (R. 16):

"X Q. * * * Do you know of any such thing as pyroxylin lacquer?— A. Yes, sir.

"X Q. What is it, please?—A. I would describe pyroxylin lacquer as any lacquer, any varnish-type of material, which contains pyroxylin and by pyroxlin I mean a form of nitrocellulose [one of the ingredients in the three products in question].

"X Q. Would that be dissolved in something?—A. It is dissolved in suitable solvents.

"X Q. Looking at Illustrative Exhibit C, which is the formula for clear lacquer, that contains nitrocelluose?—A. Yes, 9.3 per cent.

"X Q. It also contains solvents, does it not?—A. Yes.

"X Q. Please look at Illustrative Exhibit D. That contains nitrocellulose?— A. Yes.

"X Q. And also solvents?—A. Yes.

"X Q. And also Illustrative Exhibit E, that also contains nitrocellulose?— A. Yes, right.

Plaintiff's identification of the merchandise as pyroxylin lacquer agrees with defendant's characterization."

In contending that the "Lacquer Sealer" and "Lacquer" under consideration should be classified under paragraph 75, as amended, *supra*, counsel for plaintiff, in their brief, present two propositions. It is argued, first, that the provision in said amended paragraph for "Varnishes, * * * not specially provided for" is predicated on "use," and, therefore, under a well-established tariff rule, should take precedence over the descriptive language of paragraph 30, *supra*, as it provides for "liquid solutions of pyroxylin, of other cellulose esters or ethers, or of cellulose." Where such principle has been invoked, it has been applied to a provision which included a word or words indicative of the use upon which the ultimate classification was based. This was true in all of the cases cited by plaintiff and which we now refer to briefly.

*Katz & Co.* v. *United States*, 4 Cust. Ct. 327, C. D. 354, held the provision in paragraph 1021 of the Tariff Act of 1930 for "all other *floor* coverings not specially provided for" [italics added] to control over the general one for "Manufactures of * * * sea grass," in paragraph 1537 (a) of said act.

"The classification of leather as '*bag, strap, case, football,* and *glove* leather,' [paragraph 1431 of the Tariff Act of 1922] depended upon the *use* to be made of such leather." [Italics added.] *United States* v. *Tausig & Pilcer, Chas. Redden*, 18 C. C. P. A. 421, T. D. 44681, which was cited with approval in *United States* v. *Bosca Reed Mac-Kinnon Co. et al.*, 21 C. C. P. A. 358, T. D. 46888, holding merchandise invoiced as "rough tanned hides" to be classifiable as leather, not specially provided for, under paragraph 1606 of the Tariff Act of 1922, rather than under said paragraph 1431, upon a showing that the merchandise was not chiefly used for any of the purposes implied by the language used in the latter paragraph.

"*Standard newsprint* paper" [italics added], provided for in paragraph 1772 of the Tariff Act of 1930, is a designation by use and contemplates only such paper as was chiefly used for printing newspapers at and prior to the time of enactment of the Tariff Act of 1930. *United States* v. *C. J. Tower & Sons*, 26 C. C. P. A. 1, T. D. 49534.

Electric vacuum cleaners and electric floor polishers, found to be chiefly used in the household, were held to be classifiable as *household* utensils, rather than as machines. *Frank P. Dow Co., Inc.* v. *United States*, 21 C. C. P. A. 282, T. D. 46816.

The omission of any qualifying or descriptive words in the provision under which classification is sought for the merchandise in question makes the reasoning followed in the cited cases inapplicable to the issue before us, and renders all of said cases distinguishable from the present one.

As we stated in our previous decision, C. D. 1100, *supra*, "the statutory term 'Varnishes' is an *eo nomine* designation, clear and

unambiguous, and without any suggestion that the element of 'use' shall have any influence in classifying merchandise thereunder." Used in the plural and followed by the words of limitation, "not specially provided for," in paragraph 75, as amended, *supra*, the provision for "varnishes" embraces a particular kind or class of products not elsewhere provided for. Support therefor is found in the common meaning of the noun "varnish," given in Webster's New International Dictionary, second edition, as follows:

1. A liquid preparation which, when spread upon a surface, dries by evaporation or oxidation, forming a hard, lustrous coating (more or less transparent unless pigments have been added), serving for decoration and protection. There are a few natural varnishes or lacquers (see LACQUER, 2 b). Artificial varnishes are divided into two classes: a. Oil varnishes, which are essentially solutions of resins (natural or artificial) or of asphalt in drying oils, esp. linseed oil and tung oil. Driers and thinners (as turpentine) are usually added. b. Spirit varnishes, which are solutions of resins (natural or artificial), asphalt, cellulose esters (as pyroxylin), etc., in volatile solvents, as alcohol, spirits of turpentine, or amyl acetate. A common spirit varnish is a solution of shellac in alcohol. Varnishes containing pigments are usually called *enamels, japans,* or *lacquers.*

Analyzing this definition, it can be said that a "varnish" is a liquid preparation, made up of definite ingredients, imparting peculiar properties that control the behavior of the substance. There are several classes, each made of different materials. All are susceptible of different uses. None has a particular or chief use, which is the criterion for tariff classification under the "use" principle.

It seems clear, therefore, that the provision for varnishes, not specially provided for, in paragraph 75, as amended, *supra*, is not a classification controlled by use of merchandise.

The second point raised by plaintiff concerns the principle of relative specificity which counsel, in their brief, present by saying that "were it not for the provision of Paragraph 75 for varnishes, they [the products in question] would unquestionably be dutiable as classified under Paragraph 30 as liquid solutions of pyroxylin not specially provided for."

If the language of the statute were in accordance with the phraseology used by plaintiff in stating the issue under discussion, the legal proposition would be materially different from that which is actually before us. The statement quoted from plaintiff's brief transfers statutory language from one of the competing provisions to the other, defeating each of its true meaning and depriving them of their proper legal effect. In other words, said paragraph 75, as amended, invoked by plaintiff, uses the residuary phrase, "not specially provided for," in conjunction with the term "varnishes," but the said phrase is omitted from the descriptive language of paragraph 30, *supra*, adopted by the collector. Amended paragraph 75, *supra*, as it covers varnishes, not specially provided for, will apply only after all other provisions,

relating to a class or kind of varnish, have been exhausted. It follows therefrom that the provision for "liquid solutions of pyroxylin" in said paragraph 30, describing one of the kinds of spirit varnish within the definition hereinabove set forth, is carved out of the catch-all provision in paragraph 75, as amended.

Since the record establishes—if the fact is not actually conceded by plaintiff—that the products in question are solutions of pyroxylin, they are, for the stated reasons, not within the provisions of said amended paragraph 75, as claimed, but are more specifically provided for in paragraph 30, *supra*, as classified.

We therefore adhere to our previous decision, C. D. 1100, *supra*, as it related to the merchandise invoiced as "Lacquer Sealer" and "Lacquer," and sustain the collector's classification of such products.

Consistent with our conclusion, concerning the last two named commodities, are the following excerpts from the "SUMMARY OF TARIFF INFORMATION, 1929," compiled by the United States Tariff Commission for use of the Committee on Ways and Means in its consideration of adjustments in the Tariff Act of 1922. Under the general heading "VARNISHES" (p. 351), in said publication, the following information is found:

*Description and uses.*—Varnish is a homogeneous liquid which, when applied to a surface, dries by evaporation of the volatile solvent or by evaporation of the solvent and oxidation of the oil and resins to a more or less impervious elastic film. * * *

Varnishes may be divided into three classes: (1) Spirit varnishes, which are a solution of a gum resin, for example, shellac in a volatile solvent, such as grain or wood alcohol or a mixture of the two; (2) oil varnishes, which contain a gum resin, a drying oil (linseed, China wood), a thinner, and a drier; (3) *pyroxylin lacquers which consist of cellulose nitrate dissolved in a solvent are dutiable under paragraph 30*. [Italics ours.]

In the same volume (p. 153), referring to paragraph 30 of the Tariff Act of 1922, comparable paragraph of the Tariff Act of 1930, the following reference to pyroxylin lacquers is found under the heading of "CELLULOSE ESTERS AND SOLUTIONS OF PYROXYLIN":

* * * The large scale production of satisfactory solvents, other than alcohol and ether, for dissolving pyroxylin and various cellulose esters has greatly facilitated the development of lacquers derived from cellulose.

Production of these lacquers has increased rapidly in recent years. Nearly every American automobile manufacturer uses nitrocellulose lacquers for finishing cars. There is also an extensive use of these lacquers for furniture and interior house painting. For automobiles the lacquer is applied by the spray method, and for furniture either by spray or brush.

It is considered unnecessary to review the tariff history suggested in the brief of Government counsel.

To the extent indicated the protests are sustained and judgment will be rendered accordingly.